382 So.2d 1071 (1980)
Jimmie Lee DAY
v.
STATE of Mississippi.
No. 51535.
Supreme Court of Mississippi.
April 16, 1980.
James J. Fougerousse, Jackson, for appellant.
A.F. Summer, Atty. Gen. by Catherine Walker Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
*1072 En banc.
LEE, Justice, for the Court:
Jimmie Lee Day was convicted in the Circuit Court of Hinds County, Honorable William F. Coleman, presiding, on a charge of armed robbery and was sentenced to serve a term of thirty-five (35) years in the custody of the Mississippi Department of Corrections, with fifteen (15) years of the term suspended, twenty (20) years to be served, and probation for a period of five (5) years. Day appeals.
The principal question presented is whether or not the trial court erred in admitting Day's oral confession in rebuttal for the purpose of impeaching his direct testimony on the trial.
On June 6, 1978, at approximately 11:00 p.m., two (2) persons entered the Majik Market convenience store, 525 North Jefferson Street, Jackson, Mississippi, and robbed the proprietor of approximately three hundred dollars ($300.00). Gregg Schweiger and Judy Lightner were working in the store, and Suzanne Rhodes was present, visiting Judy at the time.
The two men entered the store, one moved to the checkout counter and the other toward the cooler; the first man went behind the counter, displayed a gun and announced that the place was being robbed. The robbery was completed in a few minutes, and the robbers fled the scene. Arthur Sims was apprehended a short while later with the weapon, and the money was recovered. He told the officers that appellant participated in the robbery. Appellant was apprehended the next day in Canton.
While Schweiger was unable to make an identification of appellant, Judy Lightner positively identified him as the unarmed bandit and she remembered seeing his accomplice, Arthur Sims, enter and leave the store a few minutes before the robbery. Suzanne Rhodes closely observed appellant during the robbery; she identified him in two lineups, had known him prior to the robbery, and made a positive in-court identification of him.
After appellant's arrest, he was taken to the Jackson Police Department and was interviewed by Detectives David Fondren and Al Stubblefield. They advised the appellant of his Miranda rights and appellant requested an attorney. The detectives continued talking with him and, according to them, appellant made a free and voluntary statement, admitting his participation in the robbery. At trial, a motion was made to suppress the statement given to the detectives after appellant requested an attorney, and the trial judge sustained the motion.
During trial of the case on its merits, after the State rested, appellant took the stand as a witness in his own behalf and denied that he participated in the robbery, or that he had any knowledge of the robbery until after its occurrence. He admitted that he had driven his automobile to the scene of the robbery accompanied by Arthur Sims and three (3) other individuals, that he was outside doing some work on his automobile, that Arthur Sims and an unidentified individual ran out of the store, and told him that they had robbed it, whereupon, the appellant took his car keys from the vehicle and also fled.
Upon cross-examination of the appellant, over objection, he was asked about the oral statement taken by the detectives. He testified that he had asked for an attorney but denied having made any statement to the detectives. When appellant rested his case, the State offered in rebuttal for impeachment purpose the oral statement by appellant to Detectives Fondren and Stubblefield. Over objection, the court admitted the testimony as to the oral statement for purpose of impeachment only. He granted the following instruction:
"The Court instructs the Jury that proof of the oral statements made by the Defendant may not be considered as evidence that he committed the crime of Armed Robbery. They may, however, be used for the limited and sole purpose of ascertaining his credibility as a witness."
The appellant contends that the action of the trial judge in admitting the testimony *1073 of Detectives Fondren and Stubblefield pertaining to the oral statement of appellant taken after he had requested an attorney, violates his constitutional rights and is prejudicial error. He relies upon Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) wherein the rule was stated on custodial interrogation of an accused:
"If, however, he [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning... .
* * * * * *
... The right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today... . Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." 384 U.S. at 444-45, 469-70, 86 S.Ct. at 1612, 1625-26, 16 L.Ed.2d at 707, 721.
The holding in Miranda has been restated many times by courts of most, if not all, jurisdictions and is so well established that it is not necessary to cite additional authority. However, the rule has been amplified and enlarged upon since Miranda.
In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), Harris was indicted for selling heroin. He was questioned by the police when taken into custody, but had not been advised of his right to appointed counsel. The court excluded his inculpatory statement on the prosecution's case in chief. Harris' testimony at the trial contradicted and was inconsistent with the statement which he had made to the police and the trial court admitted it in rebuttal for the purpose of impeaching his credibility as a witness. The jury was instructed that such statements could be considered only in passing on Harris' credibility and not on his guilt. There was no claim that the inconsistent statements were coerced or involuntary. In holding that the statements, although inadmissible on the prosecution's case in chief, were admissible in rebuttal for the purpose of impeaching the credibility of Harris, the court said:
"Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.
Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. * * * Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.
The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." 401 U.S. at 225-226, 91 S.Ct. at 645-646, 28 L.Ed.2d at 4-5.
The United States Supreme Court considered the same proposition in Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). The two cases differ in that no Miranda warning was given in Harris, while the warning was given in Hass. He was arrested on suspicion of burglary and, en route to the police station, he expressed the wish to telephone his attorney. The officer replied that Hass could do so as soon as they arrived at the police station. Thereupon, Hass gave inculpatory information to the officer. The statement was excluded on the prosecution's case in chief, and Hass then testified to his innocence. The police officer was called in rebuttal and testified *1074 to the inculpatory information given him by Hass. The trial court instructed the jury that the rebuttal testimony could not be considered by it as proof of Hass's guilt, but may be considered only as it related to his credibility. The conviction was reversed by the Oregon Court of Appeals and affirmed by the Supreme Court of Oregon on the ground that the inculpatory statements made by Hass were improperly used to impeach his testimony. The United States Supreme Court said:
"We see no valid distinction to be made in the application of the principles of Harris to that case and to Hass' case. Hass' statements were made after the defendant knew Osterholme's opposing testimony had been ruled inadmissible for the prosecution's case in chief.
As in Harris, it does not follow from Miranda that evidence inadmissible against Hass in the prosecution's case in chief is barred for all purposes, ... and, again, making the deterrent-effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief. If all this sufficed for the result in Harris, it supports and demands a like result in Hass' case. Here, too, the shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances.
We are, after all, always engaged in a search for truth in a criminal case so long as the search is surrounded with the safeguards provided by our Constitution. There is no evidence or suggestion that Hass' statements to Officer Osterholme on the way to Moyina Heights were involuntary or coerced. He properly sensed, to be sure, that he was in `trouble'; but the pressure on him was no greater than that on any person in like custody or under inquiry by any investigating officer.
The only possible factual distinction between Harris and this case lies in the fact that the Miranda warnings given Hass were proper, whereas those given Harris were defective. The deterrence of the exclusionary rule, of course, lies in the necessity to give the warnings. That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in Harris, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and to the officer who is aware of the defect the full deterrence remains. The effect of inadmissibility in the Harris case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth.
* * * * * *
We, therefore, hold that the Oregon appellate courts were in error when they ruled that Officer Osterholme's testimony on rebuttal was inadmissible on Fifth and Fourteenth Amendment grounds for purposes of Hass' impeachment. The judgment of the Supreme Court of Oregon is reversed." 420 U.S. at 722-24, 95 S.Ct. at 1221, 43 L.Ed.2d at 577-578.
In the present case it is not contended that the statement given to the officers was coerced or involuntary. Testimony of the officers and appellant indicates that no force, threats or promises of reward were used to obtain the statements.
This Court has applied the rule stated in Harris and Hass, supra. Booker v. State, 326 So.2d 791 (Miss. 1976), while not directly involving the request for an attorney, discussed the two United States Supreme Court decisions, stated the question to be whether the confession of a defendant, inadmissible on the prosecution's case in chief, may be used to impeach the defendant's credibility when his trial testimony contradicts his prior statements. There, this Court held the defendant's statement was not admissible on the case in chief, but, being voluntary, was admissible to impeach the defendant when he made statements contradictory to the confession.
In Murphy v. State, 336 So.2d 213 (Miss. 1976), the question was identical with the *1075 one here. Murphy gave statements after she had requested an attorney and the trial court held they were not admissible for that reason. In holding that the statements were admissible in rebuttal, for the purpose of impeaching Murphy and for the purpose of reflecting on her credibility, the Court said:
"In her testimony defendant denied that she told David Tindall to shoot her father to get him out of his misery. This testimony was contradicted by the deputy sheriff.
The contradictory statement of defendant was made to the deputy sheriff under conditions similar to those made by the defendant in Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) in that the statements were made in both cases in response to questioning by officers after defendants requested an attorney. In Hass the defendant had been arrested when the contradictory statements were made, whereas in this case the defendant had not been arrested... .
* * * * * *
In the instant case the statement made to the deputy sheriff was not admissible made to the deputy sheriff was not admissible by the state on its case in chief for the reason stated by the trial judge in his ruling. However, it was not the result of coercion, duress, threats or promises and was therefore admissible for the purposes of impeaching the credibility of the defendant as a witness." 336 So.2d at 215, 216.
See also Simmons v. State, 358 So.2d 1324 (Miss. 1978).
The Court further held that the accused is entitled to an instruction that contradictory statements may not be used as proof of guilt but may be considered only in passing on the defendant's credibility as a witness, if requested by him.[1]
Prior to Miranda, it was not mandatory that he be advised of the constitutional rights therein enumerated. His statement only was required to be free from coercion and duress and to be voluntary. Miranda imposed severe restrictions on police activity. This Court may not impose greater restrictions as a matter of Federal constitutional law, upon which this case is based, when the United States Supreme Court specifically refrains from imposing them,[2] and should not do so as a matter of Mississippi law.
The conviction and judgment are affirmed.
AFFIRMED.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, WALKER, BROOM, and BOWLING, JJ., concur.
SMITH, P.J., and COFER, J., dissent.
SMITH, Presiding Justice, dissenting:
The utmost temerity is required to dissent from a result arrived at by the combined wisdom of my colleagues. I do so with the greatest deference.
As I understand the majority decision, it does not deprive a suspect under interrogation of his right to be informed of what have become known as his "Miranda rights," nor relieve his official interrogators of their duties with respect thereto.
In his isolated and helpless condition, Day was being interrogated by two officers in the interrogation room. The officers discharged their duty to inform him of his "rights," and among other things, told Day that he had a right to have an attorney present, that if he could not afford an attorney one would be provided and that if he desired an attorney all questioning would cease until an attorney was present.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 1602 (1966):
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time, prior to or during questioning, that *1076 he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion subtle or otherwise... . If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning... .
.....
[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today... . Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.
The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial. See Crooker v. California, 357 U.S. 433, 443-448, 78 S.Ct. 1287, 1293-1296, 2 L.Ed.2d 1448 (1958) (Douglas, J., dissenting).
Day accepted the offer of an attorney by asking that one be provided him. This request was declined or refused by the officers, the reason given being that the "clerk's office was closed." At this point, according to what they had just told Day, all interrogation should then have ceased. But the officers did not stop the interrogation but continued to question Day, who was, for all practical purposes, being held incommunicado. Not only was he denied his right to an attorney, but he had no access to friends, relatives or anyone else. In this situation, as the result of the continued interrogation, Day is said to have made the incriminating statements attributed to him. He was never told that any statement he made could be used at his trial as an "impeachment."
Upon the above facts, the trial court sustained Day's motion to suppress the statements. However, upon the trial, when Day sought to exercise his statutory right to testify as a witness in his own behalf, the court permitted him to be cross-examined as to the interrogation and admitted the inculpatory statements said to have been obtained after his request for an attorney had been rejected. This procedure is justified because, it is suggested, the jury is told that the incriminating statement is only to be considered by way of "impeachment," and is to be forgotten on the issue of guilt.
The action of the trial court in sustaining the motion to suppress, I respectfully submit, amounted to a correct ruling that the officers, under the circumstances, had illegally obtained the statements. With the testimony of the officers, admitted by the trial judge, before the jury, that Day had confessed or made inculpatory statements to them, the idea that the jury will not consider such testimony upon the issue of guilt but will limit it in some way to impeachment of Day as a witness, I find it impossible to accept.
Day, in the interrogation room with the two officers, having just been told by them that if he desired an attorney one would be provided, and that interrogation would cease until an attorney was present to represent him, almost in the same breath was told that his request made in response thereto would not be granted because the "clerk's office was closed." Again, contrary to what he had just been officially told, the interrogation continued without an attorney until the incriminating statements had been obtained. Such statements, I submit, must be considered as having been obtained illegally, and the rejection of Day's effort *1077 to exercise his right to an attorney, followed by continued interrogation, must be considered coercion, rendering the results of the interrogation inadmissible as evidence against him, whether on the case in chief or by way of impeachment.
It appears that we have now reached a situation which can only be described as anomalous. On the one hand we say that the law requires officers to explain his Miranda rights to a suspect under interrogation, while at the same time we approve the use of incriminating statements obtained by interrogators who blithely ignore the efforts of a suspect to exercise such rights. While conceding, apparently, that exclusion of a statement thus illegally obtained as part of the prosecution's case is proper, we allow such statements to be introduced by way of cross-examination of a defendant who testifies as a witness. In my view, it is not in keeping with human nature or common human experience to imagine that this distinction is not one of semantics, rather than of reality and substance.
Day was faced with a true dilemma. He was presented with two alternatives, each of which was equally deadly, no matter which alternative he chose. He discovered at his interrogation that the officers had not meant a word of what they had told him as to his rights and that no attorney was going to be provided him, notwithstanding his request. Moreover, and again contrary to what he had been told, the interrogation did not cease but was continued.
Nor was the choice offered Day of the same kind as the choice confronting a defendant who, having been previously convicted of felony, must elect between giving up his right to testify to establish his defense, or to testify and thus subject himself to impeachment by proof of his former conviction. In such a case, a former conviction is the result of the defendant's own unlawful act. Incriminating statements attributed to Day were products of his unlawful interrogation by representatives of the State and the denial by them of his acknowledge legal rights.
There is no contradiction of the fact that Day was denied an attorney after informing his custodians that he desired one. Nor is it controverted that the interrogation of Day, in his heavily disadvantaged situation, continued until the statements were obtained. His request for an attorney, isolated as he was from friends and without advice or counsel, in the interrogation room with the two officers who had him in custody, was in direct contravention of rights about which he had just been informed.
In my humble view, however desirable and necessary the enforcement of the criminal laws may be, it must be done without resort to illegal methods. A confession, or incriminating statement, obtained under the circumstances in this case should remain incompetent for any purpose.
If the rule approved in the majority opinion is to be adhered to, we should declare quite frankly and clearly for the benefit of the bench and bar, as well as law enforcement officers, that statements obtained by interrogators from a suspect in violation of the latter's Miranda rights are nevertheless admissible in evidence, discarding the "distinction" as to whether such statements are used in chief, in rebuttal or on cross-examination. In my judgment it is not in keeping with traditional notions of fair play and substantial justice to require officers to inform a suspect that he has certain rights at his interrogation and at the same time approve the action of the officers in completely ignoring the attempts of the suspect to exercise such rights. If we should continue to require that officers repeat the Miranda formula at interrogation of suspects, they should be required to go one step further, they should inform the suspect of a very material fact; although his request for an attorney is ignored and the interrogation continues unabated, if he makes a statement it can be used against him in evidence at his trial as an impeachment if he takes the stand. If the suspect is not made aware of this there is a fatal deficiency in the warning.
COFER, J., joins in this dissent.
NOTES
[1] The appellant here requested and was granted the instruction by the trial court.
[2] Oregon v. Hass, supra.