**Eddie BRADLEY, Petitioner-Appellant,**

**v.**

**Arnold R. JAGO, Superintendent, Southern Ohio Correctional Facility, Respondent-Appellee.**

**No. 78–3236.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 20, 1979.

Decided March 27, 1979.

---

Eddie Bradley, pro se.

Joseph C. Merling, Legal Aid Society of Cincinnati, Cincinnati, Ohio (Court-appointed CJA), for petitioner-appellant.

William J. Brown, Atty. Gen. of Ohio, Richard David Drake, Asst. Atty. Gen., Columbus, Ohio, for respondent-appellee.

Before CELEBREZZE and LIVELY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

LIVELY, Circuit Judge.

This is an appeal from the district court's denial of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted by a jury in an Ohio court of the crime of murder. The district court considered seven grounds asserted by petitioner in support of his claim for relief. We affirm the district court's denial of the writ. We have considered each of the arguments made by petitioner on appeal and find that only one requires discussion.

Three eye witnesses who were acquainted with the petitioner saw him stab the victim near the doorway to the apartment of one of the witnesses. The petitioner then left. While a police officer was investigating at the scene of the stabbing the telephone rang. One of the occupants of the apartment answered the telephone, then handed it to the officer, saying, "It's him." The petitioner asked about the victim and was told he was still alive, but in the hospital. When the officer attempted to persuade the petitioner to surrender, "at that point he hung up."

The petitioner testified at his state trial for murder. After describing an argument between the victim and himself inside the apartment, the petitioner testified as follows:

When I got outside, I was going down to go down the steps. He kick me. He came out behind me. He kicked me.

So, I turned—I almost fell down the steps. I pulled my knife out. He tried to grab the knife, and that's when he got cut.

Q Then what happened?

A I left. Went on down and caught the bus and went on to the west side.

Q What is on the west side?

A A friend of mine, girlfriend.

Q Did you make a phone call to the home?

A Yes; I did.

Q Did you speak to the detective, or, someone at the home?

A Well, I spoke to a policeman, whoever it was. I don't know who it was. I asked how the guy was doing, or, what kind of shape he was in.

Q Then what happened?

A The police asked me—told me to give myself up, so, I just hung up and, later on, after I found out the guy was dead, I went on and gave myself up, which I didn't mean to do it.

* * * * * *

Q Where were you when you were kicked with relationship to the threshold of the door?

A I just had walked out the door fixing to go down the steps.

Q Now, what is the distance between the threshold of the door and the steps?

A About three to four feet, I guess.

Q How many steps?

A Two, at the most.

Q After you were kicked and you turned, where were you standing?

A After he kicked me, I almost fell down the steps. I caught on the banister. When I turned, I pulled my knife. That's when he came after me. He tried to jab the knife. That's when he got cut.

* * * * * *

Q After you were kicked and you turned with the knife in your hand, did you plunge the knife into Junior?

A No; he ran into it.

Q You say he ran into it?

A The way I see it, he was trying to grab it.

The petitioner was cross-examined as follows:

Q You didn't stay and explain to the police who responded that this was an accident; did you?

MR. HURLEY: Objection.

THE COURT: Overruled.

A No; I didn't.

Q When you talked to the policeman on the phone, you didn't explain that Junior reached for this weapon?

MR. HAFFEY: Objection.

THE COURT: Overruled.

Q Did you?

A No; I didn't.

Q You didn't even tell the officer where you were; did you?

MR. HAFFEY: Objection.

THE COURT: Overruled.

A Yes; I told him I was on the west side.

Q Did you tell him anything further about where you were?

A No; I didn't. He didn't ask me nothing about it.

Q And, you weren't going to volunteer it?

A I gave myself up; didn't I?

Q When you talked to the officer, shortly after the stabbing occurred, you weren't going to volunteer where you were; were you?

A He asked me where I was and I told him.

Q You told him, "on the west side"?

A Yes.

MR. HAFFEY: Objection, your Honor. He is trying to answer the question.

THE COURT: The objection is overruled. But, it is repetition.

Go on to something else, Mr. Prosecutor.

The district court held that it was error to permit the prosecutor to ask the petitioner whether he had told the officer on the

telephone that the stabbing was accidental and that the victim had reached for a weapon. It was the view of the district court that it was improper to permit impeachment of a defendant by asking him, in effect, if he had failed to offer an exculpatory explanation of his actions. The district court found that this questioning violated the rule of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In view of the overwhelming evidence of guilt the court found the error harmless.

We do not read *Doyle* to prohibit an attempt to impeach a defendant by cross-examination concerning his failure to offer an exculpatory explanation when the opportunity to do so came before he was in custody and before he had received any advice of his right to remain silent.

The opening paragraph of the opinion in *Doyle v. Ohio, supra,* states the issue in that case as follows:

> The question in these consolidated cases is whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. We conclude that use of the defendant's post-arrest silence in this manner violates due process, and therefore reverse the convictions of both petitioners. 426 U.S. at 611, 96 S.Ct. at 2241 (footnote omitted).

After stating that it would be fundamentally unfair to permit the prosecution to call attention to a person's silence at the time of arrest *after that person has been advised of his right to remain silent,* the opinion of the Supreme Court concludes with this holding:

> We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. 426 U.S. at 619, 96 S.Ct. at 2245 (footnote omitted).

*Doyle* applies to those situations in which a defendant is entitled to rely on the implicit assurance of the *Miranda* warnings

that silence carries no penalty. 426 U.S. at 618, 96 S.Ct. 2240. In contrast, where a defendant has not received warnings, there is nothing unfair in permitting jurors to hear that a defendant initially failed to offer his exculpating version of events after they have heard his version at trial. It is not to be presumed that failure to explain at that time resulted from an exercise of the Fifth Amendment right to remain silent. The fact that the defendant did not offer the exculpatory explanation when he had an earlier opportunity to do so is evidence which the jury is entitled to hear, and from which it may draw reasonable inferences.

The judgment of the district court is affirmed.