IRVING, J,
 

 for the Court:
 

 ¶ 1. Jeffrey Shelley was convicted of sale of cocaine by a Warren County jury, and the Warren County Circuit Court subsequently sentenced Shelley to twenty years in the custody of the Mississippi Department of Corrections, with fifteen years to serve and five years of post-release supervision. The circuit court ordered that the sentence be served consecutively to another sentence that Shelley was already serving. Feeling aggrieved, Shelley appeals and contends that the circuit court erred in allowing the State to proceed with an allegedly improper peremptory strike and in failing to object sua sponte to remarks made by the prosecutors during closing argument.
 

 
 *381
 
 ¶ 2. Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 3. Shelley was in Vicksburg, Mississippi, on July 27, 2007, when he was approached by Christian Franklin Johnson, a woman who Shelley knew. The record indicates that Shelley and Johnson knew each other from them involvement in using and purchasing illegal drugs. However, unbeknownst to Shelley, on July 27, Johnson was working as a paid informant for the Vicksburg Police Department (VPD). On that day, Johnson was driving a vehicle that had been equipped by the VPD with several hidden cameras.
 

 ¶ 4. Officer Jeff Merritt with the VPD testified that the VPD chose to conduct undercover drug buys at a particular location in Vicksburg because the VPD “had received numerous complaints of drug activity in that area.” He testified that Johnson was a successful informant who was paid fifty dollars a day for her work with the VPD. Officer Merritt explained that, on July 27, Johnson was searched by VPD officers before driving an “undercover” VPD vehicle to the location where Johnson encountered Shelley. There is no evidence indicating that Johnson contacted Shelley prior to driving to the location chosen by the VPD. Officer Merritt testified that Johnson was given forty dollars in city funds with which to purchase drugs. Officer Merritt explained that, on July 27, the VPD was not targeting any particular individual, but “just that particular area due to the complaints we received.” Officer Merritt testified that Johnson had no access to the cameras that were in the vehicle. During cross-examination, Officer Merritt acknowledged that Johnson was “a self-admitted user of drugs.”
 

 ¶ 5. At trial, Johnson testified that she saw Shelley at the location where the VPD had instructed her to go. She stated that she knew Shelley, but that she had not seen him in a long time. Johnson explained that, after exchanging pleasantries, she told Shelley that she wanted to “get a [forty],” after which Shelley got in the vehicle with her. She testified that she and Shelley drove to a nearby house, where she handed Shelley the forty dollars in city funds before Shelley exited the vehicle. She further testified that Shelley went to the back of the house before he returned with crack cocaine that he placed in her hand. Johnson testified that, as Shelley handed her the crack cocaine, he stated “that’s a pretty good [forty].” During cross-examination, Johnson stated that she had never bought drugs from Shelley before July 27, 2007. Video footage from the car was also played for the jury.
 

 ¶ 6. Paige Mills, an analyst at the Mississippi Crime Laboratory, testified that she tested the substance that was submitted to her by the VPD. Mills testified that her examination led her to conclude that the substance contained four-tenths of a gram of cocaine.
 

 ¶ 7. Shelley’s wife, Séptima Johnson, testified on his behalf. She testified that Shelley had a drug addiction but that she had never known him to sell drugs.
 

 ¶ 8. Shelley testified that on July 27, 2007, he was employed as a construction worker, but that he had the day off. He testified that he spent the day “hanging out” with “some people.” Unlike Johnson, Shelley testified that he and Johnson had used drugs together “numerous times.” Shelley admitted that he is the person that can be seen on the videotape of the drug buy. Shelley explained that, when Johnson stated that she needed a “forty,” he thought: “I guess she wanted me to sell her 40, but I don’t sell. I don’t sell drugs. She knew where I could get it at.” Shelley stated that he then took her to the
 
 *382
 
 house of a drug dealer named “Terrance.” Shelley stated that the item that was in his hand as he exited Terrance’s house was not crack cocaine, but was a piece of paper with a telephone number on it. Shelley testified that he gave Johnson’s money back to her and gave her a phone number where he could be reached.
 

 ¶ 9. During the conference on jury instructions, Shelley requested and was given an entrapment instruction. After closing arguments, the jury retired and subsequently found Shelley guilty of selling cocaine. At his sentencing hearing on July 9, 2008, the circuit court sentenced Shelley to twenty years’ imprisonment, with the sentence to run consecutively to a sentence that Shelley was already serving. The circuit court then revoked Shelley’s probation for the prior sentence and ordered that Shelley receive drug and alcohol counseling while in prison.
 

 ¶ 10. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Batson Challenge
 

 ¶ 11. In his first issue, Shelley contends that the circuit court erred in allowing the State to proceed with a peremptory strike in light of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In
 
 Batson,
 
 the United States Supreme Court noted that a prosecutor has wide leeway in using peremptory strikes, but that “the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race....”
 
 Id.
 
 at 89, 106 S.Ct. 1712.
 

 ¶ 12. In reviewing the circuit court’s ruling on the State’s peremptory strikes, we remain mindful that we “re-vie[w] a trial court’s ruling on a
 
 Batson
 
 challenge with great deference and will not overturn the trial court’s ruling unless it is clearly erroneous or against the overwhelming weight of the evidence.”
 
 Pruitt v. State,
 
 986 So.2d 940, 942 (¶ 8) (Miss.2008) (citing
 
 Flowers v. State,
 
 947 So.2d 910, 917 (¶ 8) (Miss.2007)). As our supreme court has explained:
 

 When addressing a
 
 Batson
 
 challenge, a trial court employs a three-step procedure: (1) the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose; (2) once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible, race-neutral justifications for the strikes; and (3) if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.
 
 Johnson v. California,
 
 545 U.S. 162, 168, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129, 138 (2005). The burden remains on the opponent of the strike to show that the race-neutral explanation given is merely a pretext for racial discrimination.
 
 Hicks v. State,
 
 973 So.2d 211, 219 [ (¶ 23) ] (Miss.2007) (citing
 
 Berry v. State,
 
 802 So.2d 1033, 1042 [ (¶ 29) ] (Miss.2001)).
 

 Id.
 

 (4) ¶ 13. Shelley objected to the State’s peremptory strike of Juror No. 126. The record reflects following a colloquy concerning the juror:
 

 THE COURT: Okay. Next one ... No. 126.
 

 [PROSECUTOR]: [Juror No. 126] wears his hair in long braids. I don’t accept jurors — male jurors with hair longer than my co-counsel. It tends to
 
 *383
 
 show nonconformity. And for the record, I also don’t accept male jurors that [sic] wear earrings. That’s — and the Supreme Court has said that dress, hairstyle and appearance are race-neutral reasons.
 

 THE COURT: What says the defendant?
 

 [DEFENSE ATTORNEY]: Your Hon- or, as someone who doesn’t style myself to the standard or the norm, I would object to that as a non-race-neutral reason for striking a juror. I don’t think that that should have any bearing on his decision to be able to judge a case or be able to determine whether someone is innocent or guilty.
 

 [PROSECUTOR]: For the record, I’d respond.
 
 I have accepted no
 
 jurors—
 
 no Caucasian male jurors with long hair.
 

 THE COURT: Okay. I’m going to accept that as a race-neutral reason. That’s fíne.
 

 (Emphasis added). Shelley contends that the State’s reason for striking Juror No. 126 “was not race-neutral and amounted to a pretext for racial discrimination.”
 

 ¶ 14. Here, Shelley made a prima facie case of discriminatory use of peremptory strikes, and the State then offered a nondiscriminatory reason for the strike. After hearing argument from both the State and the defense, the circuit court determined that the State’s reason was race-neutral. We note again that the burden remained on Shelley to prove that the State’s reason for the strike was pretextual.
 

 ¶ 15. Our supreme court has noted that there are:
 

 five indicia of pretext that are relevant when analyzing the race-neutral reasons offered by the proponent of a peremptory strike, specifically:
 

 (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; ... (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.
 

 Flowers,
 
 947 So.2d at 917 (¶ 9) (quoting
 
 Manning v. State,
 
 765 So.2d 516, 519 (¶ 9) (Miss.2000)).
 

 ¶ 16. As to the first indicia, there is no dispute that there were no unchallenged Caucasian members of the panel with long hair. As to the second, there was no voir dire of Juror No. 126 regarding the length of his hair. There is no indication that long hair in any way relates to the facts of Shelley’s case. As to the fourth indicia, there was no dispute that Juror No. 126’s hair was, in fact, long and braided. Finally, no evidence has been introduced that long hair on a male is a group-based trait. We find that the five indicia support the circuit court’s finding that the State’s reason for striking Juror No. 126 was race neutral.
 

 ¶ 17. This Court has found that a prosecutor’s striking of a potential juror because she was inattentive and had dyed her hair was a race-neutral reason.
 
 Jackson v. State,
 
 5 So.3d 1144, 1149-50 (¶ ¶ 18-20) (Miss.Ct.App.2008). In so finding, we noted that “a race-neutral reason for a strike can be some aspect of a prospective juror’s appearance not particular to any race, such as wearing a beard or having long, unkempt hair.”
 
 Id.
 
 at 1149 (¶ 19) (citing
 
 Purkett v. Elem,
 
 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). Furthermore, we note that multiple courts, including the United States Supreme Court, have found that long hair or other hairstyles is a sufficient race-neutral rea
 
 *384
 
 son for a peremptory strike.
 
 Purkett,
 
 514 U.S. at 768-69, 115 S.Ct. 1769 (holding that prosecutor’s explanation that he struck a potential juror for having “long, unkempt hair, a mustache, and a beard” was a race-neutral reason);
 
 U.S. v. Clemons,
 
 941 F.2d 321, 325 (5th Cir.1991) (holding that the State “articulated non-racial reasons, those being age, hairstyle, and dress” and that “[a]ge and appearance have been recognized as legitimate reasons for peremptorily striking potential jurors.”);
 
 State v. Washington,
 
 288 S.W.3d 312, 316-17 (Mo.Ct.App.2009) (holding that prosecutor’s peremptory strike of a juror for having a “very precise and very individualistic hairstyle” was a race-neutral reason).
 

 ¶ 18. There is no merit to this contention of error.
 

 ¾.
 
 Prosecutor’s Closing Argument
 

 ¶ 19. In his second issue, Shelley contends that the court erred in “failing to object, sua sponte, to the State’s inflammatory ‘send[-]a[-]message’ remarks made during closing arguments.”
 

 ¶ 20. In
 
 Spicer v. State,
 
 921 So.2d 292 (Miss.2006), our supreme court adopted a two-part test to be used in determining whether a “send-a-message” argument is reversible error. That test was later altered slightly by our supreme court in
 
 Brown v. State,
 
 986 So.2d 270 (Miss.2008). As the
 
 Brown
 
 court explained:
 

 Depending upon the facts and circumstances of each case, “send-a-message” arguments may — standing alone — constitute reversible error.
 
 Payton v. State,
 
 785 So.2d 267, 271 (Miss.1999). In
 
 Payton,
 
 this Court found the following “send-a-message” statement to be reversible error:
 

 Send a message to these older, more mature, criminals, “We are not going to let you ruin young people’s lives like you have ruined these three people’s lives, and all these lives you endangered in the process.”
 

 Id.
 
 at 270.
 

 We recently addressed this issue in
 
 Spicer v. State,
 
 921 So.2d 292 (Miss.2006), in which we set forth two threshold inquiries, followed by a two-pronged test. The first threshold question is whether defense counsel objected. We noted that, despite the absence of objection, we will not procedurally bar the issue where “the [send-a-message] argument is so ‘inflammatory’ that the trial judge should have objected on his own motion.”
 
 Id.
 
 at 317 (internal citations omitted).
 

 Spicer’s second threshold inquiry is whether it appears, in examining the surrounding circumstances, that defense counsel invited the comment.
 
 Id.
 
 at 318. If so, of course, the issue may be waived. Once the two threshold questions are satisfied,
 
 Spicer
 
 provides that, for a finding of reversible error, “the court must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused’s rights.”
 
 Id.
 
 (internal citations omitted). In attempting to clarify the application of the test, we stated that
 

 [i]t must be clear beyond a reasonable doubt, that absent the prosecutor’s comments, the jury could have found the defendant guilty. This goes beyond a finding of sufficient evidence to sustain a conviction.
 

 Id.
 
 (internal citations omitted).
 

 In analyzing this language in
 
 Spicer,
 
 we find we should have employed the term “would” instead of “could.” Thus, to meet the second prong of the test, we hold that it must be clear beyond a reasonable doubt that, absent the prose
 
 *385
 
 cutor’s inappropriate comments, the jury would have found the defendant guilty. This, of course, amounts to a harmless-error analysis, and is the analysis to be used for the second prong of the
 
 Spicer
 
 test.
 

 Brown,
 
 986 So.2d at 275-76 (¶¶ 12-16) (footnotes omitted). The
 
 Brown
 
 court also had the following to say about a prosecutor’s decision to use a “send-a-message” argument:
 

 The jurors are representatives of the community in one sense, but they are not to vote in a representative capacity. Each juror is to apply the law to the evidence and vote accordingly. The issue which each juror must resolve is not whether or not he or she wishes to “send a message” but whether or not he or she believes that the evidence showed the defendant to be guilty of the crime charged. The jury is an arm of the State but it is not an arm of the prosecution. The State includes both the prosecution and the accused. The function of the jury is to weigh the evidence and determine the facts. When the prosecution wishes to send a message they should employ Western Union. Mississippi jurors are not messenger boys.
 

 Id.
 
 at 275 (¶ 11) (quoting
 
 Williams v. State,
 
 522 So.2d 201, 209 (Miss.1988)).
 

 ¶ 21. In the present case, the prosecutor made the following remarks during the State’s initial closing argument:
 

 We did our part, and now it is time for you to do your part. It’s time for you to help us get drugs off of our street, to help us get these drugs off the street by getting the criminals that sell the drags off the streets. We must all do our part.
 

 [[Image here]]
 

 Now, the attorney for [the] defendant wants you to believe that he was just helping a friend. Well, does the fact that he was helping a friend or the fact that they’re friends somehow change the fact that he, in fact, sold drugs to her? In fact, as small as Vicksburg is, I’m sure there are plenty of drug dealers out there who are selling drugs to their friends.
 

 [[Image here]]
 

 So as I told you before, it’s time to do your part, and this may be the only opportunity that you have to play a part, to play a definite part in cleaning the drugs off of our streets, and not only cleaning the drugs off of our streets, but the defendants who sell drugs. Ladies and gentlemen, do your part this afternoon, and find the defendant ... guilty of [the] sale of cocaine.
 

 ¶ 22. During her closing argument, Shelley’s attorney made the following remarks:
 

 Ladies and gentlemen of the jury, when we talked eaxlier this morning, most of you admitted that we do have a drug problem here in Warren County, and I think most of you, when you leave here today, you will continue to agree to that. But the reason for the drug problem here in Warren County is not Jeffrey Shelley. Jeffrey Shelley is a victim of the drug problem in Warren County.
 

 ¶ 23. A different prosecutor then concluded the State’s closing arguments with the following remarks:
 

 On July 27, 2007, Jeffrey Shelley did what Jeffrey Shelley does. He violated the law. He sold some cocaine. And regardless of what he says on the stand, ... he sold cocaine, and it wasn’t entrapment. And he’s not such a great guy that he deserves a third chance. Okay. He takes you for fools. He’s been getting away with it since he can remember. I’m upholding mine. I’m not
 
 *386
 
 letting drug dealers get away with it. What are you going to do?
 

 No objection was made by Shelley during the State’s remarks.
 

 ¶ 24. We find that the remarks were clearly improper. The State asked the jury, on multiple occasions, to do their part to get “drugs off the streets.” This was improper. The only question before the jury was whether Shelley had committed the crime of selling cocaine on July 27, 2007, yet the prosecutors’ remarks went far afield of that question. Since there was no objection to the remarks, we would have to find that the remarks were so “inflammatory” that the circuit court, in accordance with
 
 Spicer,
 
 was required to object sua sponte. We make no such finding.
 

 ¶ 25. Our supreme court has stated the following regarding when an appellate court will find that an error is harmless:
 

 An error may be found ... to be harmless beyond a reasonable doubt only “where the weight of the evidence against the accused is overwhelming.”
 
 Clark v. State,
 
 891 So.2d 136, 142 [ (¶ 29) ] (Miss.2004) ([quoting]
 
 Riddley v. State, 777
 
 So.2d 31, 35 [ (¶ 12) ] (Miss.2000)). A harmless-error determination “requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant’s guilt.”
 
 Hopkins v. State,
 
 799 So.2d 874, 879 [ (¶ 10) ] (Miss.2001) [ (quoting
 
 Cooley v. State,
 
 391 So.2d 614, 623 (Miss.1980)) ]. A harmless-error determination is made based on a de novo review of the record.
 
 [Arizona v.] Fulminante,
 
 499 U.S. [279,] 295, 111 S.Ct. 1246 [113 L.Ed.2d 302] [ (1991) ].
 

 Walton v. State,
 
 998 So.2d 971, 976 (¶ 14) (Miss.2008).
 

 ¶ 26. Having weighed and considered the totality of the circumstances, including the facts, the context of the improper remarks, and any prejudice that may have been created by them against the strength of Shelley’s guilt, we find that any error in allowing the prosecutors to make improper remarks was harmless at worst. The evidence against Shelley, which included video footage and Johnson’s testimony, was overwhelming. It is clear beyond a reasonable doubt that the jury would have found Shelley guilty, even absent the improper remarks. Therefore, we find that no reversible error flowed from the remarks made during closing argument.
 

 ¶ 27. THE JUDGMENT OP THE CIRCUIT COURT OF WARREN COUNTY OF CONVICTION OF SALE OF COCAINE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIFTEEN YEARS TO SERVE AND FIVE YEARS OF POST-RELEASE SUPERVISION, WITH THE SENTENCE TO RUN CONSECUTIVELY TO THE SENTENCE IN WARREN COUNTY CAUSE NUMBER 05-0305CRV, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WARREN COUNTY.
 

 LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY.