HANCOCK *v.* STATE.

Division B. Oct. 2, 1950.

No. 37551 (47 So. (2d) 833)

Wm. D. Brooks, and Crawley & Brooks, for appellant.

**George H. Ethridge,** Assistant Attorney General, for appellee.

**Roberds, P. J.**

Hancock was convicted of manslaughter in the killing of Dixie Ola Hancock, his twenty-one-months old girl, and sentenced to twenty years in the state penitentiary.

On this appeal, he urges (1) that the evidence is insufficient to sustain the verdict; (2) that the court erred in refusing to permit him to propound to the prospective jurors on the voir dire examination certain questions; (3) that the court erred in permitting the State to introduce in evidence pictures of the body taken after death; and (4) in excluding from the jury the testimony offered by defendant as hereinafter specified. We will deal with these questions in the order stated.

The first question necessarily requires a summation of the evidence. Appellant contends he did not kill the child. He says its mother, the wife of appellant, killed her.

The tragedy occurred in October 1948. Appellant, when he testified, was thirty-three years of age. He had previously served three or four years, at home and abroad, in the United States Marine Corps. He and his wife had two children, Dixie Ola and another girl three years of age. He was a tenant, and the family resided some ten miles from Kosciusko, Mississippi.

On the morning of Tuesday, October 19, 1948, about eight-thirty o'clock he appeared at the office of Dr. Willard Barnes in Kosciusko, and asked Dr. Barnes to go to his home to see his sick child. He and the doctor proceeded to his home in the doctor's automobile. On the way Hancock told the doctor the child had been sick for several days; that it had had difficulty walking, and he did not know what the trouble was. On arrival at the Hancock home, Dr. Barnes found Dixie Ola lying upon a table, some two feet high, in front of, and some three or four feet from, an open fire. She wore night clothing. It was evident at once the child was dead. Dr. Barnes testified she had been dead some ten hours. He found her body badly mutilated. It had upon it, from the bottom of the feet to the top of the head, many cuts, bruises, abrasions and wounds, covering the entire body, including the face. Appellant, in response to inquiry

by Dr. Barnes as to the cause of the mutilations said: ". . . he had switched or spanked it, or something to that effect, a few days previously." Dr. Barnes told appellant an investigation should be made, and he should obtain a permit to bury the child. The two returned to Kosciusko, and Dr. Barnes notified the sheriff and the undertaker. Hancock went to the funeral home. He inquired of Coleman, the undertaker, whether the sheriff would want to go out "and look at the baby." Coleman asked if he had not had a doctor attend the child and Hancock replied: ". . . he had not up to the time it died." Asked by Mr. Coleman the cause of the death, appellant said: ". . . it was walking across the floor and his wife hollered at it and it fell and hit its head on the floor, and I asked him when that was and he said it was three or four days." Coleman also testified appellant said the child had been unconscious for a couple of days.

The sheriff and Roy Braswell, a deputy, and T. L. Thweatt, insurance agent for the funeral home, and an employee of that home, then went to the Hancock home. Mr. Braswell and Mr. Thweatt testified. Braswell testified the child was yet in front of the fire. He described the wounds in these words: "It was very bad, bruised up all over its body, almost black on its legs, was skinned up and bruised up and had already turned blue and black more or less, and most of those I'll say down below the knees, the biggest part of it, and all over its face and head was almost solid bruises—cuts and bruises . . . around the eye—one of the eyes and back of the head just above the ear was a bad place and had several cuts on the side of its face, more or less on the side, and lots of places on the back of its legs about the hips of the child, legs and hips." Thweatt also described the wounds, which we need not repeat.

The body was brought to the undertaker and pictures were made of it. There Dr. Barnes made a more thorough examination of the remains.

The body was brought to Jackson, Mississippi, for examination by Dr. F. G. Bratley, Doctor of Medicine and a Pathologist. He made a thorough examination of, and performed an autopsy upon, the body. After saying there were many abrasions and lacerations over the entire body he described two in particular. These were upon the child's head. He said ". . . there were two particularly on the scalp, one at the top of the head and one over the back surface of the head. These were lacerations and they were rather deep. The one over the back of the head was about one inch in length, and the one on top of the head was about three-quarters of an inch in length." He also made an internal examination. He said he found some pus in the kidneys. He thought that infection had been present for some two weeks; it might have existed longer, but not over a month and a half at the longest. He said there was a blood clot of some two ounces over the surface of the brain. This was from some small vessels which go between the covering of the brain and the brain tissue itself. He said the brain tissues were swollen "due to the increase in fluid in the brain." He examined a laceration in the leg; took a particle therefrom and examined it under the microscope. He said that showed a hemorrhage extended from the skin down to the muscle. He said the hemorrhage had existed at least three days "and it could have been there for a period of a week to ten days." He did not think all the contusions and wounds had been inflicted at the same time. He was asked his opinion as to the cause of the death of the child and replied: "In my opinion the cause of the death was edema, that is, swelling of the brain and brain tissues along with the hemorrhage on the surface of the brain, aided also by these many lacerations and contusions and abrasions over the surface of the body, the chief cause being the edema or swelling of the brain." He said the natural consequence of the swelling of the tissues would be to

produce unconsciousness within about six hours after the blow.

Hancock was arrested and placed in jail. The deputy sheriff and district attorney there interviewed him. Braswell, deputy sheroff, testified they asked Hancock if he had whipped the child and he replied he had whipped it with a small switch some two feet long, ''and had whipped it pretty hard all right''; that on Saturday afternoon, before the Tuesday morning Dr. Barnes found the child dead, ''he said the child had a falling out spell in the kitchen, stayed unconscious for a little while''; that on Sunday morning, ''or some time Sunday'', it fell off a woodpile and skinned its head, and that Sunday afternoon he whipped it to make it walk and get some exercise.

Shelton, a detective, visited appellant in jail. Hancock told him, so Shelton testified, that he had whipped the child on numerous occasions; that occasionally he got limbs off a peach tree in his back yard and whipped the child with these; that on Sunday night before the Tuesday the child was found dead ''. . . the child fell in the floor unconscious and its mother was cooking supper and he tried to make it walk from him to its mother and back and said it made the trip once or twice and it fell.'' They picked up the child and it was unconscious; they ate supper; that around two or three o'clock in the morning the house was cold; his wife got up and made a fire and laid the baby before the fire; that next day, Monday, he was away from home and when he returned in the afternoon the child was still asleep or unconscious. They went to bed and Tuesday morning she was still unconscious or asleep. He then went for the doctor.

Mrs. S. H. Jones testified for the State. She lived about a quarter of a mile from the Hancocks. Hancock and his wife came to her house about noon Sunday. They ate lunch at her home. Neither child was with them. Hancock said they were at home asleep. They remained at her home until nearly three o'clock in the afternoon, and said they were then going to Mr. Greer's. That night,

while on her porch, she heard a child crying. She went to the Hancock home Tuesday morning about 8:30 and saw Dixie Ola. She was dead.

The foregoing recitals are drawn from testimony of the State.

For the defense, Mrs. Nina Hancock, mother of defendant, said defendant and his family had resided in her home some four or five weeks. He had attacks of malarial fever. Defendant was kind to the children. However, friction developed between the mother and the family of defendant and she asked them to move out of her home, which they did.

Mrs. Willene Murphy, first cousin of defendant, said he and his family resided in her home some two weeks, and appellant treated the children in a kindly manner.

Herschell Hancock, brother of defendant, said appellant was affectionate towards his children. He said, however, he was much surprised to learn Dixie Ola had been beaten so badly and appellant had done nothing about it. He was shown the pictures and could not understand why defendant had not gotten a doctor.

Mrs. Eula Hancock, wife of Herschell Hancock, said appellant was affectionate towards the children.

G. G. Carter testified appellant had been working for him prior to the time of this deplorable event. Hancock worked for him Friday. That was his last day. Defendant said he was ill. Witness went to the home of appellant Monday morning to ascertain why he had not been at his work since Friday. He said he saw both children on the front porch Monday morning. Defendant told him he was looking for a place to which to move. This witness said he came back on Tuesday morning. Defendant said he wanted to go for a doctor. Witness saw the child, realized it was dead, backed out of the room and told Hancock he needed an ambulance, not a doctor. However, Hancock insisted on going for a doctor and witness carried him to Kosciusko.

Hancock testified. He told of his service abroad with the Marines; living for a time in the home of his mother and of Mrs. Murphy. Summed up on the important question of his guilt he said Dixie Ola died as a result of beatings administered by his wife. In other words, he said it was his wife, not he, who killed the child. He was permitted to relate to the jury the details of numerous acts of cruelty he claimed his wife committed upon this child and his efforts to prevent them. The wife had been tried and acquitted. It is not clear whether the husband testified at her trial. She did not testify at his.

He said he was away from home Monday, October 18th, until around five-thirty o'clock in the evening; that he had malarial fever; that night his wife tried to assault him with a stick about two-thirds as large as his wrist, and he took the stick away from her. He took a sleeping pill and went to sleep. Tuesday morning he awakened about 6:30. The child was on the table in front of the fire. Shortly thereafter Carter came. Witness wanted to go for a doctor. Carter thought the child was dead. He went for Dr. Barnes, who, on reaching the child, immediately said she was dead and had been dead for eight or ten hours. He related his trip to the funeral home and then again out to his own home. He told Braswell the child had fallen and that he switched it on Saturday. He agreed to the autopsy.

On cross-examination witness admitted he told the district attorney the child fell in the kitchen about six o'clock Sunday afternoon and became unconscious; said he did not tell the district attorney, who interviewed him in jail after his arrest, of the various acts of cruelty on the part of the wife which he related upon the stand; admitted he told district attorney he whipped the baby Saturday about two o'clock, but said on the stand that was not true. Said he was protecting his wife who was pregnant. He was asked "Did you state on that occasion that you whipped her pretty hard?" and replied "Yes,

I told you that on that occasion for the simple reason I realized you had brains enough to know somebody had''; admitted he told the district attorney he had ''. . . cut the skin on her hips and legs,'' but said that was not true. He checked the child's heart Sunday night. His reason for so doing he gave in these words: ''I didn't know but what it might be dead. When I picked it up it was unconscious and I checked it to see.'' Admitted that on Sunday he and wife went to home of Mrs. Jones for dinner and later to Greer's, leaving the children in bed in the home; got back three-thirty to four o'clock; children still asleep. Denied either cried out, as Mrs. Jones had intimated. He was asked ''When did it become unconscious permanently?'' and he replied ''Sometime during the day on the 18th of October.'' Shown the pictures he said the big bruises shown therein had been on the child since October 10th. He also said ''Most of these bruises you see around her face had been on there since around the 14th''; some, he said, had been on the child for ten days. Admitted that when Dr. Barnes asked him about the bruises on the child's body he told Dr. Barnes he had whipped the child with a switch, but on the stand said that was not true.

Was this sufficient to support the verdict of the jury?

It is obvious the jury might reasonably have deduced these, among other, conclusions:

The child was killed either by the mother or the father or both of them. The circumstances admit of no intimation anyone else had anything to do with it. Death could not have been accidental. The pictures are before us, as well as the oral proof descriptive of the extent and number of mutilations of this child. It is absurd to argue that a fall on the floor, or on a woodpile, could cause these wounds. Only violent, external force could produce them. That force, under this record, could only have been applied by one, or both, of the parents. The wife has been acquitted. After that, appellant says she did it.

Defendant, as a witness, contradicted in various material respects what he had theretofore told others, as to the extent he whipped the child, when the whippings took place, and when he became aware the child was unconscious. He discredited himself. But the jury had the right to accept as true what other witnesses testified appellant told them. Doing that, we have his admission that he cruelly and inhumanly whipped and beat this helpless infant, and this to within a few hours before, or perhaps to the time, of its death.

The lacerated condition of the body would indicate to any normal person the child was likely to die, certainly in dire need of a doctor, yet no doctor was called, although appellant admits many of the wounds had been on its body for ten days.

The child was dead early Monday night according to Dr. Barnes. Appellant must have known that, yet no alarm was given, nothing done by the father, until Tuesday morning, when Carter saw the child was dead and informed defendant he needed an ambulance, not a doctor. Even then appellant persisted in getting a doctor, pretending he did not know the child had gone to that place prepared for little children.

These deductions, and others, the jurors had the right to draw from this record. They were warranted in finding appellant guilty.

As to the second question, able counsel for defendant, on the voir dire examination, requested, but was denied, permission of the trial judge to ask the prospective jurors this question: ''Gentlemen, would the fact that Mrs. Elon Hancock, the wife of the defendant, had confessed to this crime, been tried for such offense and acquitted thereon, have any bearing on the verdict which you would render in this case?''

Appellant says that action of the judge was reversible error. We do not think so for these reasons:

First, the question did not include the fact that Mrs. Hancock had repudiated her supposed confession.

Second, the test is not whether some matter, or event, might have some bearing, one way or the other, on the verdict, but whether the jurors had formed or expressed an opinion as to the guilt or innocence of the accused, and whether they could hear the evidence and arguments, give the defendant a fair trial, and return a just and fair verdict. While the voir dire examination is not in the record, we may properly, and, no doubt, correctly assume that each accepted juror swore under oath that he would do that. It is a proper assumption because that is the test laid down by the law and no complaint is made on this appeal, and none was made in the lower court, as to the qualification, or fairness, of any juror who served in the case.

Third, it was immaterial whether someone else had been tried and acquitted of the crime. In this connection, we might say that the trial judge was very liberal in permitting appellant as a witness to relate many acts of cruelty, according to his contention, his wife committed upon Dixie Ola.

As to the third question, three photographs of the body, in different positions, were made after it had been carried to the funeral home. These were admitted in evidence over objection of defendant. He says they were inadmissible because (1) there is no proof the body was in the same condition when the pictures were made as it was at the time of death; (2) the sight of the pictures was calculated to incite the emotions of the jurors against defendant; and (3) they were not shown to be true and accurate.

The first proposition requires an impossible condition. No one, unless it be the parents, knows exactly when the child departed this life. In fact, appellant contends he did not know the child was dead when he went for the doctor Tuesday morning. To require pictures to be made at the exact time of death, in cases of this kind, or at the exact time of accidents, in cases of that type, or under

other circumstances which might be mentioned, would exclude all pictures in such cases. All that is required, as to the time of making photographs, is that they be verified as substantial representations of the conditions as they existed at the time in question. Oral proof can explain the changed conditions. "Photographs of the scene of an accident taken at or near the time are not always obtainable, and the only practical rule would seem to be that the changes must not be such as to destroy the substantial identity and that the changes, whatever they may be, should be carefully pointed out and brought to the jury's attention." 20 Am. Jur., Sec. 731, p. 611. Indeed, the effect of appellant's testimony is that no bruises or abrasions had been made upon the child within the previous ten hours before Dr. Barnes saw it. In other words, within that time, no additional wounds or bruises had been made upon the body. Under the testimony no changes had taken place since death other than what naturally might have been slight discolorations resulting from decomposition.

As to the effect upon the jurors of the exhibition to them of the photographs of the body, it is true the pictures present a rather gruesome sight, and we do not say there may not be cases where this should not be done. That depends more upon their pertinency and relevancy than their effect. Seals v. State, Miss., 44 So. (2d) 61, 68. If they are pertinent, material and relevant as evidence, the defendant is not in position to complain of them if he brought about the condition. The pictures were especially relevant in this case. Defendant says he only whipped the child and that too with a small switch. The pictures show much greater force and violence than that were used. They depict a condition, both as to the nature and the extent of the wounds, and their location upon the body, which could not have been produced by use of a small switch as appellant says he used it. These photographs are silent, but unimpeachable, witnesses of

the extent of the wounds inflicted upon this child. They materially contradict the testimony of the appellant.

■■ Again, it is argued the proof fails to show they correctly depict the conditions. That is based upon two ideas, that the pictures do not bring out all of the various colorings, nor do they show fully and completely the head wounds. Now, both doctors, the undertaker and the photographer testified these pictures were accurate and correct representations of the physical condition at the time they were taken. The photographer did say they did not disclose slight discolorations underneath the skin, but he also said the type film he used would disclose various shades of coloring from gray to solid black; that his equipment was suitable and usual for the purpose; that the pictures, as developed, were true, accurate representations of the object depicted, and were about as accurate as could be made. The court, in passing upon and overruling the objection in this respect to the photographs, said the proof disclosed that this machine brought out all details as correctly and accurately as any picture-making equipment would bring them out. The pictures show head wounds. Further description was given by Dr. Bratley. The swelling of the brain was internal and, of course, could not show in any photograph of the external part of the head. The pictures, under this record, were properly admitted in evidence.

■■ Lastly, appellant says the case should be reversed because the court excluded from the jury certain proffered testimony on his behalf.

Mrs. Nina Hancock, mother of appellant, was asked "Did you ever observe defendant's wife mistreat the children?" The court sustained an objection to her answering that question in the presence of the jury. In so doing, the court did not commit error. The question is too general, even if otherwise competent. Mistreatment is a broad, general term, covering a wide scope of conduct. The wife was not being tried. The court said it would admit proof of the actual killing of the child

by the mother if such proof could be made. Defendant, as a witness on the stand, later said she did kill the child, and, as related above, detailed many acts of cruelty towards the child on her part, Under those circumstances, it is not perceived how the action of the court as to the question under consideration could have prejudiced the defendant. That is especially true since no answer appears in the record, and the lower court did not know, and we do not know, what the answer would have been.

Mrs. Murphy, first cousin of the defendant, testified in the absence of the jury that in July, before the time of the homicide, that at her home she saw the wife of appellant throw a fit of temper, push Dixie Ola from the porch of the home, and kick the child. She further testified Mrs. Hancock ". . . treated it good at times and at times she wasn't." The court excluded this from the jury on the grounds (1) to that time there had been no proof Mrs. Hancock killed the child; and (2) the incident was too remote. We might add that at this hearing the wife could not be retried all over again and, in addition, defendant got the benefit of the conduct of the wife towards the child, insofar as the jury gave credence to the testimony, when the court permitted him to detail various acts of cruelty committed by the wife, as he contended, upon Dixie Ola.

Witness Carter, as above herein shown, testified he went to the Hancock home on Tuesday morning. He was asked by counsel for defendant "Did you hear him tell his wife 'If you whip that baby again I will kill you, God damn you?'" The district attorney was in the course of objecting to this question when the witness interjected "I certainly did" in the presence of the jury. The court sustained the objection and instructed the jury to disregard the answer. Appellant says that constitutes reversible error. That statement was no part of the res gestæ and was purely self-serving. In addition to this, the proof is undisputed the girl then had been dead

some ten hours, and the idea that the wife was then in the process of whipping, or just previously had whipped, the body of this child, and defendant was undertaking to prevent her doing so again, is so unreasonable and re-volting as to be unbelievable.

It may be, and very likely is, the fact that appellant did not intend to kill his child, yet if it came to its death as a result of his acts, as the jury had the right to adjudge them under this record, he was guilty of man-slaughter. Sec. 2232, Miss. Code 1942.

Affirmed.

**Coleman, C.,** took no part in the consideration of this case.