427 So.2d 111 (1983)
Thomas Andrew PALMER, Jr.
v.
STATE of Mississippi.
No. 53549.
Supreme Court of Mississippi.
February 16, 1983.
*112 Hall, Callender & Dantin, Maurice Dantin, Columbia, for appellant.
Bill Allain, Atty. Gen. by Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, P.J., and BROOM and DAN M. LEE, JJ.
WALKER, Presiding Justice, for the Court:
This case is an appeal from the Circuit Court of Pearl River County, Mississippi, wherein the appellant, Thomas Andrew Palmer, Jr., was convicted of capital murder and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Feeling aggrieved with the verdict, the appellant has perfected an appeal to this Court.
On September 11, 1980, Albert LaVigne, the husband of the victim, notified the Picayune Police Department at 7:30 p.m. that his wife, Veronica LaVigne, was missing. Mr. LaVigne had returned home from work at approximately 5:00 p.m. and had become concerned when he could not locate his wife at the homes of family and neighbors. Enlisting the aid of others, Mr. LaVigne searched the town and nearby Boley Creek where Veronica had last been seen that day.
Mrs. Veronica LaVigne, who was eighteen years old, frequently swam and sunbathed at a sandbar on Boley Creek which was approximately one-half mile from the LaVigne home. Mrs. Creel, the victim's sister-in-law, testified that Veronica had asked her to drop her off at the bridge near the Boley Creek sandbar between 12:00 and 1:00 p.m. on Thursday. Mrs. Creel was the last person to see the victim alive. Veronica LaVigne's body was found the next morning by Alice Creel in a densely wooded area approximately fifty to seventy-five yards from the area in which Veronica normally sunbathed. The autopsy report stated the victim died from bimanual strangulation and three .22 calibre gunshot wounds in the abdomen. In addition, the victim had been severely beaten in the head, neck, face, shoulder and chest regions resulting in numerous fractures to her facial bones.
The police investigation of the crime revealed that a St. Regis Paper Company pickup truck had been seen parked near the Boley Creek bridge on September 11 around 12:30 to 1:00 p.m. On Monday, September *113 15, Lieutenant Lorance Lumpkin of the Picayune Police Department and Sheriff Lawrence Holliday of Pearl River County went to the St. Regis office and questioned the employees as to their whereabouts on the day of the murder. None of the employees stated that they were in the Boley Creek area that day. Lumpkin's attention was drawn to Thomas Andrew Palmer, Jr., the defendant, who appeared very nervous when questioned as to whether his truck was at Boley Creek on September 11, but Palmer denied that he had been in the area. At 4:50 p.m. that afternoon, Lumpkin and Holliday received a call at the Criminal Justice Center in Picayune, Mississippi, from Palmer who stated that he wanted to talk with the officers. Lumpkin and Holliday met with Palmer at the St. Regis' office and Palmer stated that he had not been completely truthful with them earlier in that he did stop to fish on his lunch break at the Boley Creek bridge on Thursday, September 11. Palmer explained that the reason that he did not tell them the truth earlier was because he did not want his secretary to tell his wife that he was in that area on the day of the murder. The defendant admitted that while he did own several rifles and shotguns, that he did not presently own a .22 calibre pistol. (Palmer elaborated that he previously owned a small .22 calibre pistol but had given it to a friend in Florida). Palmer was read his Miranda rights (which was later denied by Palmer at trial), and then voluntarily accompanied the officers to Boley Creek and showed them where he had parked his truck. However, Palmer denied that he had seen the victim or that he knew of any information about the murder. Lumpkin led Palmer into the thick underbrush and walked through the area where the body was found. Without prompting, the defendant stopped at the scene of the crime within a few feet of where the victim was found and stated that this was about as far as he had ever gone into the woods surrounding the creek. At this point, Sheriff Holliday asked the defendant if he had killed Veronica LaVigne. The defendant stated that he did not kill the victim and continually repeated that though "it looked bad for him, that he did not do it." When asked about a grease pencil that was found near the victim, Palmer said that while he used grease pencils in his work as a forester, that he often lost his pencil because he carried it in his shirt pocket. (No fingerprints were found on the grease pencil).
Later, on their way to Slidell, Louisiana, Palmer again admitted to the officers that he had lied. He stated that he had misled the officers by telling them that he had given away the.22 calibre pistol while in Florida. The defendant then admitted that he owned a .22 calibre pistol but became afraid after summoning the officers to his office late Monday afternoon. The.22 calibre pistol was later recovered from Palmer's office at the St. Regis Paper Company.
Late that evening, after several hours of questioning, Thomas Palmer, Jr., admitted to the murder of Veronica LaVigne. Palmer's first confession was heard by L.L. Lower, Picayune Chief of Police. The defendant then recounted substantially the same story in the presence of Chief Lower, Sheriff Holliday and Mason Sistrunk, a special investigator with the district attorney's office. Palmer's third confession was held inadmissible by the trial judge due to the fact that Palmer had requested an attorney and had not received legal representation at the time of the third confession. The record clearly indicates that at no time was Palmer beaten, threatened, psychologically tortured or promised anything in return for his confession. Every officer who was present at the time of each confession testified as to Palmer's understanding of his rights and the voluntariness of his statement. At trial, Palmer was placed on the witness stand and admitted that he made the statements, but testified that they were made when he was tired, confused and scared.
He further testified that though he was in the area of the crime on the day in question, he did not murder Veronica LaVigne. The defendant produced numerous witnesses who stated that the Thomas Palmer they knew, could not have committed *114 such a heinous crime and that if Palmer had indeed killed Mrs. LaVigne, he must have been crazy at the time of the crime. The State and the defense placed psychologists and psychiatrists on the stand who testified as to the mental state of the defendant and the jury was instructed on the question of the defendant's sanity.
The jury returned a verdict finding Thomas Andrew Palmer, Jr., guilty of the capital murder of Veronica LaVigne but declined to sentence him to suffer the death penalty at the sentencing hearing and instead found that he should be sentenced to life in prison.
The defendant's motion for a new trial and motion for J.N.O.V. was overruled and the defendant has perfected his appeal to this Court and assigns eight errors of the trial court for review.

I.
The appellant assigns as his first error for review that the lower court erred in not granting the appellant's motion for a hearing prior to trial on his motion to suppress his confessions.
The orderly administration of justice dictates that the trial judge be vested with a considerable amount of discretion with respect to trial calendaring and docket management.
The record indicates that the appellant's motion to suppress was timely made on March 16, 1981, but was overruled shortly thereafter on March 25, 1981, on the basis that:
[D]ue to the extra heavy case load of the Pearl River County docket during this the March, A.D., 1981 term that said request should be denied; and further that should any oral or written confession be attempted to be introduced by the prosecution during the trial herein, that before said confession can be heard and considered by the jury a separate suppression hearing will first be held outside the presence of the jury, and therefore the request for a suppression hearing on a date prior to the trial date herein is hereby denied.
We find that there was no abuse of discretion by the trial court refusing to hear this matter at a separate hearing before trial. A trial judge must be allowed considerable discretion in scheduling cases and hearings. The motion was considered and heard at trial in the absence of the jury and no prejudice to the defendant has been demonstrated as a result of the trial court's order.

II.
The appellant's second assignment of error is that the lower court erred in not granting the appellant's motion to suppress the appellant's alleged confession.
The record is replete with the testimonies of all officers involved in the questioning of appellant and there is no evidence to suggest the appellant did not knowingly and intelligently waive his rights or that his confessions were not wholly voluntary. We find that the trial judge correctly ruled that the appellant's first two confessions were admissible; also that the third confession was inadmissible due to the questioning by Officer Lumpkin after the appellant had requested the assistance of counsel.
We find no error in the trial court's denial of the motion to suppress the appellant's two confessions which were admitted in evidence.

III.
The appellant assigns as his third assignment for review that the lower court erred in not sustaining the appellant's objection to Instruction S-3.
On appeal, the appellant contends that the instruction was faulty in that it did not include an essential element of the crime of kidnapping, to-wit: "... with intent to cause such person to be secretly confined or imprisoned... ."[1] However, at trial, the appellant's objection was as follows:

*115 [Appellant] objects to the instruction in that it does not properly state the law as to kidnapping and does  is not supported by the facts and evidence presented in this case.
The appellant's objection constituted a general and not a specific objection in that the appellant's attorney should have stated in his objection wherein the instruction did not comply with the law of kidnapping. Counsel cannot state a general objection to the trial court and then claim on appeal that the lower court erred. Our firmly established rule is that objections to instructions in the trial court must be specific and not general so that the trial judge has the opportunity to rule on the particular grounds relied on. Matters not brought to the attention of the trial court for correction may not be raised on appeal, except jurisdictional matters.
We note Mississippi Supreme Court Rule 42 expressly provides that:
[A]ttorneys are required to dictate their specific objections to an instruction offered, thus giving the trial judge an opportunity to pass upon the objections before the case is argued before the jury. It is, therefore, the rule of this Court that no assignment of error based on the giving of an instruction to the jury will be considered on appeal unless specific objection was made to the instruction in the trial court stating the particular ground or grounds for such objection. However, in extreme cases this Court may raise an objection to a jury instruction in order to prevent manifest injustice.
See Petty v. State, 332 So.2d 413 (Miss. 1976); Entrican v. State, 309 So.2d 851 (Miss. 1975).
We find that there is no merit in the appellant's third assignment of error.

IV.
The appellant's fourth assignment of error is that the lower court erred in not sustaining the appellant's motions for mistrial on the grounds of (1) excessive objections, leading questions and hearsay testimony; and (2) improper, misleading, inflammatory and prejudicial arguments by the prosecution.
After a thorough review of the record, we find no indication that the appellant was prejudiced by the prosecution's argument, questioning or objections. Our judicial system is based on the adversarial role of the prosecution and the defense, thus necessitating the need for objections on both sides concerning those matters not properly before the court. Moreover, this Court held in Summerville v. State, 207 Miss. 54, 64, 41 So.2d 377, 379, 380 (1949) quoting 58 Am.Jur. Witnesses § 571 (1948) that:
"To justify a reversal because of the allowance of a leading question, not only is it necessary that there should have been a manifest abuse of discretion, but it is also necessary that the question shall have influenced the answer and that injury resulted." Finally, as to the rule, this Court said in Miss. Utilities Co. v. Smith, 166 Miss. 105, 145 So. 896, 898, "Matters such as the introduction of proof, the asking of leading questions, etc., are largely within the discretion of the trial court."
See also 81 Am.Jur.2d Witnesses § 431 (1976).
The rule in Mississippi is that a trial court, in its discretion, may allow leading questions, and unless there has been an abuse of this discretion to the prejudice of a complaining party, it is not reversible error. See Seals v. St. Regis Paper Co., 236 So.2d 388 (Miss. 1970); Summerville v. State, 207 Miss. 54, 41 So.2d 377 (1949).
We are mindful of the phrase so often repeated in our opinions, that "although the defendant did not receive a perfect trial, he did receive a fair trial in which no reversible error occurred." See Shaw v. State, 378 So.2d 631 (Miss. 1979). We find that there was no abuse of discretion by the trial court to the prejudice of the appellant and thus the appellant's fourth assignment of error is without merit.

*116 V.
The appellant's fifth assignment of error is that the lower court erred in not sustaining the appellant's objection to prejudicial, inflammatory and gruesome photographs introduced by the prosecution.
The general rule in Mississippi concerning the admissibility of photographs depicting the scene of the crime or the victim is succinctly stated in Ford v. State, 227 So.2d 454, 457 (Miss. 1969):
As a general rule, the fact that a photograph of deceased in a homicide case might arouse the emotions of jurors does not of itself render it incompetent in evidence so long as introduction of the photograph serves some legitimate, evidentiary purpose. Slyter v. State, 246 Miss. 402, 149 So.2d 489, 150 So.2d 528 (1963); Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961); Price v. State, 54 So.2d 667 (Miss. 1951); Hancock v. State, 209 Miss. 523, 47 So.2d 833 (1950).
On the other hand, the introduction of gruesome photographs which have no useful evidentiary purpose, and which only arouse the passion and prejudice of the jury, should not be permitted to go to the jury. It is within the sound discretion of the trial judge to determine whether or not the photographs have a legitimate, evidentiary purpose. Martin v. State, 217 Miss. 506, 64 So.2d 629 (1953); Coleman v. State, 218 Miss. 246, 67 So.2d 304 (1953); 20 Am.Jur. Evidence §§ 728, 729, 730 (1939); 23 C.J.S. Criminal Law § 852(1) c, at p. 352 (1961); Annot. 159 A.L.R. 1413 (1945). ([May v. State] 199 So.[2d 635] at 640 [(Miss. 1967)]).
See Briggins v. State, 416 So.2d 691 (Miss. 1982); Edwards v. State, 413 So.2d 1007 (Miss. 1982); King v. State, 408 So.2d 1375 (Miss. 1982); Sadler v. State, 407 So.2d 95 (Miss. 1981); Tubbs v. State, 402 So.2d 830 (Miss. 1981); Steed v. State, 396 So.2d 625 (Miss. 1981); Cooley v. State, 391 So.2d 614 (Miss. 1980); Bullock v. State, 391 So.2d 601 (Miss. 1980).
Though admittedly gruesome, we find that the introduction of exhibits 10 (photo showing the victim at the scene of the crime) and 11 (photo showing the results of the brutal beating to the victim's face and head which could not have been accidental) had probative value to show that the deceased was not accidentally shot as described by appellant in his statement to authorities, and thus the court did not abuse its discretion in admitting these exhibits into evidence.

VI.
The appellant's sixth assignment of error is that the lower court erred in not sustaining the appellant's motion for a new trial.
The basis of the appellant's motion for a new trial were those covered in the preceding assignments of error. After a thorough examination of the record and the law on the above mentioned assignments of error, we can find no basis whatsoever to hold that the trial court was in error in overruling the appellant's motion for a new trial.
The appellant, through his own statements in the presence of Lieutenant Lumpkin and Sheriff Holliday, placed himself at the scene of the crime the day and time that it was committed, twice admitted lying to the investigating officers concerning his whereabouts at the time of the crime and his ownership of a small.22 calibre pistol and also admitted to the killing on two different occasions.
Having considered each error separately above, we find the appellant's sixth assignment of error is without merit.

VII.
The appellant's seventh assignment of error is that the lower court erred in not sustaining the appellant's motion for a J.N.O.V. and is wholly without merit.

VIII.
The appellant's eighth assignment of error is that the lower court erred in not sustaining the appellant's objection to Instruction S-4 dealing with appellant's defense of insanity. We are of the opinion that the instruction was technically incorrect *117 but that the defendant's evidence did not sufficiently make out a jury issue as to whether appellant was sane or insane.
The testimony of the three doctors was as follows:
DR. CHARLES STANLEY, a psychologist at Whitfield, testifying for the State:
Q. Dr. Stanley, did you make an evaluation of this man from a psychological standpoint?
A. Yes, I did.
Q. What was that evaluation?
A. Well, based on both my tests and my interviews with him, I found him to be competent to stand trial, and I found him responsible, and I found him to be without psychosis.
DR. ROBERT L. McKINLEY, JR., testifying for the State and his specialty is forensic psychiatry:
A. I felt that at the time of the alleged crime he was capable of knowing that it was wrong.
DR. RICHARD RHODEN, testifying for the defense:
Q. Do you have an opinion as to the mental capacity of Tommy Palmer at the time of the alleged commission of this crime on September the 11th, 1980?
A. Yes, I do.
Q. Would you state what that opinion is?
... .
A. All right, I believe he was suffering from psychogentic amnesia and from a long-standing personality disorder of an obsessive compulsive type.
He further testified that Palmer was not psychotic or schizophrenic. Dr. Rhoden went on to say that the personality disorder of an obsessive compulsive type had nothing to do with the realization of right and wrong. His testimony in that regard is as follows:
Q. May I ask you this question? You said that Tommy, in his condition, could be compulsive or have a compulsion to get up and double check to see if he locked the door  that may not be the way you said it, but that's what you were talking about; wasn't it?
A. Sure.
Q. So that if he had that, he would know that it was right to lock the door and wrong not to lock it; wouldn't he?
A. That would imply that he was conscious about right and wrong, about whatever thing. Really, obsessive compulsive behavior has nothing to do with is [sic] realization of right and wrong, all right.
Q. Does it have anything to do with his ability to understand the nature and quality of whatever he might be fixing to do?
A. No.
Q. Does it have anything to do with his knowing or realizing that what he was fixing to do was right or wrong, either legally wrong or morally wrong or legally right or legally wrong?
A. No, that's just merely a personality style and really doesn't affect that.
Dr. Rhoden's testimony in this regard goes to the theory of "irresistible impulse", which is not recognized as a defense in this State, rather than to the question of M'Naghten[2] sanity.
The lay witnesses for the defendant on the issue of insanity testified as follows when asked if they had any opinion as to Palmer's sanity:
JOHN BRIDGES
A... . I don't think that the Tommy Palmer that I knew could have been sane when he committed the act .
LAMONT WELLS
A. Well, if Tommy committed the crime, he's not the Tommy that I knew.
Q. As to sanity or insanity, was he sane or insane?
A. Well, in my reasoning, he would be insane.
MRS. BESS BERRY
Q. Of his sanity or insanity at the time of the commission of the crime? That's the question. Do you have an *118 opinion as to whether or not he was sane or insane at the time of the commission of the crime if he committed it?
A. He would have had to be insane, because he was sane everytime I ever saw him.
REVEREND KENNETH FLYNT
Q.  At the time of the committing of the crime? If he committed the crime, do you have an opinion as to his sanity at the time of the commission of the crime?
A. Well, I would have an opinion, and that opinion would be that if he did such a crime, that he had to be something other than I knew him.
Q. Would you describe it as to whether or not he was sane or insane at that time?
A. Well, I'd have to say he would be insane if he did it.
THOMAS ANDREW PALMER, SR.
Q. My next question was, if Tommy Palmer committed the crime charged in this case, do you have an opinion as to his sanity at the time of the alleged crime?
A. Yes.
Q. What is that opinion?
A. I do not believe he could have been sane if he did it.
The opinions of lay witnesses with regard to technical or medical matters are entitled to no greater weight than the basis from which the opinions are formed. Mere statements by lay witnesses to the effect that if the defendant committed a particular crime that he must have been insane does not raise a sufficient question of sanity for the issue to be submitted to a jury. The witnesses should have based their opinions upon conduct from which insanity could reasonably be inferred, which they did not do.
None of the lay witnesses who testified for the defendant were questioned with respect to the test of legal sanity as defined under the M'Naghten rule, i.e., whether at the time of committing the act the accused was laboring under such a defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it that he did not know that he was doing what was wrong. Harvey v. State, supra. See also Collins v. State, 361 So.2d 333 (Miss. 1978).
Both doctors testifying for the State concluded that from their examination Palmer (they testified as to what their examinations consisted) was sane at the time of the killing under M'Naghten.
Appellant's assignment of error with regard to Instruction S-4 is, therefore, without merit.

IX.
The appellant next contends that there was no proof of malice presented by the evidence and testimony at trial and for that reason the court erroneously granted Instruction S-17 defining simple murder. This assignment of error is wholly without merit. The jury verdict of "Guilty of Capital Murder" discounts any reliance on Instruction S-17 by the jury.
For the above stated reasons, the conviction and sentence are affirmed.
AFFIRMED.
PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
NOTES
[1] Miss.Code Annot., § 97-3-53 (Supp. 1982).
[2] Harvey v. State, 207 So.2d 108 (Miss. 1968).